**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE LOAN SOURCE INC. and THE 1993 STEVEN D. KRAVITZ FAMILY TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>ACAP SME, LLC,<br><br>Defendant. | |
| ACAP SME, LLC,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>THE LOAN SOURCE INC. and THE 1993 STEVEN D. KRAVITZ FAMILY TRUST,<br><br>Counterclaim Defendants. | Civil Action No. 22-1255-GBW |

Joseph B. Cicero, Gregory E. Stuhlman, CHIPMAN BROWN CICERO & COLE LLP, Wilmington, DE; Jeffrey S. Kramer, TROUTMAN PEPPER LOCKE LLP, New York, NY; Alexandra G. Lancey, TROUTMAN PEPPER LOCKE LLP, Dallas, TX.

*Counsel for Plaintiffs / Counterclaim-Defendants*

Patricia L. Enerio, Denise S. Kraft, Gillian L. Andrews, Catherine E. Lynch, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; Aaron H. Stanton, Nicholas A. Gowen. Joshua J. Cauhorn, Chicago, IL.

*Counsel for Defendant / Counterclaim-Plaintiff*

**MEMORANDUM OPINION**

September 15, 2026
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

On March 23, 2026 and March 24, 2026, the Court held a two-day bench trial on the issues of breach of contract and declaratory judgment brought by Plaintiffs The Loan Source Inc. ("TLS") and the 1993 Steven D. Kravitz Family Trust (the "Trust") (collectively, "Plaintiffs"). *See* D.I. 55. Plaintiffs allege that Defendant ACAP SME, LLC ("ACAP") breached the terms of the Amended and Restated Stock Purchasing Agreement ("A&R SPA") by failing to fund and pay fees identified in the A&R SPA. Plaintiffs also sought to hold Defendant NEWITY LLC ("NEWITY") liable, claiming that NEWITY and ACAP are the same. On March 23, 2026, the Court granted NEWITY's Motion for Partial Judgment under Fed. R. Civ. P. 52(c), thereby dismissing NEWITY from this action. D.I. 182. ACAP also asserts a counterclaim against Plaintiffs seeking the return of approximately $1.2 million dollars in alleged overdistributions arising from a separate but related contract, the Correspondent Agreement, between the parties. D.I. 140.

Upon consideration of the trial record, including the trial testimony (D.I. 196; D.I 197), the exhibits introduced into evidence, the stipulations of fact by the parties (D.I. 180, Ex. 1), and upon review of the parties' post-trial briefings (D.I. 190; D.I. 193; D.I. 194; D.I. 195), the Court concludes that Plaintiffs failed to prove that ACAP materially breached the A&R SPA, and that ACAP failed to prove that Plaintiffs owe the alleged overdistribution. Below, the Court separately sets forth its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a)(1).

# I. FINDINGS OF FACT[1]

## A. The Parties

1. TLS is a family owned and operated Small Business Lending Company ("SBLC") licensed by the United States Small Business Administration ("SBA") that has operated since 1994 as a small business lender. D.I. 180, Ex. 1 ¶ 1. Before creation of the Paycheck Protection Program ("PPP") by the federal government and ACAP's agreement to purchase TLS, TLS had a portfolio of traditional SBA Section 7(a) loans that it owned and serviced ("TLS's Legacy Portfolio"). *Id.* ¶ 39.

2. TLS is owned by the Trust. *Id.* ¶ 2.

3. ACAP is a limited liability company formed May 5, 2020, under the laws of Delaware. *Id.* ¶ 3.

4. ACAP is indirectly owned by Luke LaHaie, Kathleen LaHaie, David Cody, and Michael Tein, through intermediary entities. *Id.* ¶ 5.

## B. The Stock Purchase Transaction Between Plaintiffs and ACAP

5. On May 8, 2020, ACAP and Plaintiffs entered a Letter of Intent regarding the purchase of TLS's assets and SBLC license. *Id.* ¶ 12; PX-1; D.I. 196 at 53:3-16.

6. On May 13, 2020, TLS and ACAP entered the Lender Service Provider Agreement ("LSPA"), whereby ACAP would service TLS's loans under the Paycheck Protection Program ("PPP"). D.I. 180, Ex. 1 ¶ 38; JX-1.

[1] The Court's Findings of Fact are cited as "FF ¶ __."

7. On May 15, 2020, ACAP and Plaintiffs executed the Stock Purchase Agreement, later amended on July 10, 2020 (the "A&R SPA"), whereby ACAP would purchase shares of TLS and its SBLC license. D.I. 180, Ex. 1 ¶¶ 13-14; JX-4 § 2.02.

8. The A&R SPA provided that TLS would continue to manage TLS's Legacy Portfolio. D.I. 180, Ex. 1 ¶ 40.

9. On December 30, 2020, Plaintiffs and ACAP executed the First Amendment to the A&R SPA (the "First Amendment"). *Id.* ¶ 15; JX-7.

10. The parties agreed TLS would be paid primarily though fees earned over time by the purchasing and servicing of PPP loans. D.I. 180, Ex. 1 ¶ 17; D.I. 196 at 175:21-24.

**1. The Transfer of the Small Business Lending Company ("SBLC") License**

11. The A&R SPA provided ACAP the exclusive right to purchase TLS's SBLC license, which could only be transferred upon obtaining approval of the Small Business Administration ("SBA"). D.I. 180, Ex. 1 ¶¶ 18-19.

12. Under Section 5.10(c) of the A&R SPA, ACAP "agrees to make application to the SBA for a change in control of [TLS] and the SBLC License within thirty (30) days of the date of this Agreement, time being of the essence, and [Plaintiffs] shall use their good faith efforts to assist. [ACAP] shall obtain SBA Approval within six (6) months of the date of this Agreement (the "'SBA Approval Date'"). Buyer shall be entitled to two (2) penalty-free thirty (30) day extensions of the SBA Approval Date." JX-4 §5.10(c).

13. ACAP and Plaintiffs had distinct responsibilities with respect to the transfer of the SBLC license. ACAP was responsible for preparing the application, whereas Plaintiffs were

responsible for transmitting the application, on ACAP's behalf, to the SBA. D.I. 196 at 69:23-70:24; 99:14-100:8; 101:23-102:18; 256:12-14.

14. On July 15, 2020, TLS submitted an application for the transfer of ownership and control of TLS and its SBLC license to ACAP. D.I. 180, Ex. 1 ¶ 23.

15. In October 2020, Luke LaHaie's ("Mr. LaHaie") former employer, ExWorks Capital, filed a lawsuit against him and ACAP, alleging that Mr. LaHaie and ACAP usurped the corporate opportunity to purchase TLS's SBLC license and committed fraud. *Id.* ¶ 24.

16. Ethan Smith ("Attorney Smith"), an attorney who represented both TLS and ACAP, informed them that the SBA likely would not approve ACAP acquiring TLS's SBLC license while the litigation against Mr. LaHaie and ACAP was pending. *Id.* ¶ 25. Attorney Smith further advised the parties that waiting for the SBA to deny the application, per SBA's standard operating procedures, may negatively affect ACAP's ability to purchase TLS's SBLC license in the future. *Id.* ¶ 26.

17. Accordingly, on November 23, 2020, TLS emailed the SBA withdrawing the application for the SBA's approval of the transfer of ownership and control of TLS and its SBLC license. *Id.* ¶ 27; JX-5.

18. On December 23, 2020, the First Amendment, among other things, deleted and restated Section 5.10(c) to provide that "[ACAP] agrees to make reapplication to the SBA for a change of control of [TLS] and the SBLC License within thirty (30) days after the termination of the litigation by ExWorks Capital et.al. against [ACAP], time being of the essence, and [Plaintiffs] shall use their good faith efforts to assist. [ACAP] shall obtain SBA Approval on or before December 31, 2022 (the "'SBA Approval Date'")." JX-7 § 1(F).

### 2. The Termination Provisions

19. The A&R SPA and First Amendment provided the parties with rights to terminate the A&R SPA. First, either party could terminate if it was not in material breach and the other party had committed a material breach that would not be cured by the "Drop Dead Date." JX-4 §§ 8.01(b)(i), 8.01(c)(i). The Drop Dead Date was originally January 31, 2021 in the A&R SPA, but was extended to December 31, 2022 in the First Amendment. *Id.*; JX-7 § 1(H).

20. Second, either party could terminate, without mention of material breach, if one of the conditions in Sections 6.01 or 6.02 had not been fulfilled by the Drop Dead Date, unless the terminating party caused the condition to not be met. JX-4 §§ 8.01(b)(ii)[2], 8.01(c)(ii).

21. Third, either party could terminate in the event that the SBA Approval was not received on or before the Drop Dead Date. JX-4 § 8.01(d)(iii).

22. Section 6.01(c) Conditions to Obligations of Each Party states that "[ACAP] and [Plaintiffs] shall have received the consent of the SBA to the transfer of the SBLC License as contemplated hereunder." JX-4 § 6.01(c).

23. Pursuant to § 8.02(b), if the contract was terminated under §§ 8.01(c) or (d)(iii), ACAP owed TLS the Break-Up Fee. JX-4 § 8.02(b). If the contract was terminated under §§ 8.01(a) or (b) or (d)(i) or (d)(ii), no Break-Up Fee was owed by ACAP to TLS. *Id.*

### 3. The "Break-Up Fee"

24. The A&R SPA included a Break-Up Fee defined as "fifty percent (50%) of the first Two Million Dollars ($2,000,000) in revenue that [ACAP] collects under the [Lender Service

[2] The parties stipulated that the First Amendment's reference to Section 8.01(b)(ii) was scrivener's error. Thus, the First Amendment left unaffected Section 8.01(b)(ii), which provide ACAP (as its mirror Section 8.01(c)(ii) provided Plaintiffs) with the right to terminate, regardless of material breach, if a condition under Sections 6.01 or 6.02 had not been met. DX-1005.

Provider Agreement ("'LSPA'")], which amount shall be deposited in escrow with the Escrow Agent." D.I. 180, Ex. 1 ¶ 21; JX-4 Art. I at 2.

25. On June 29, 2020, Mr. LaHaie directed Kingdom Trust Company, as Escrow Agent, to deposit $1 million in the "ACAP Break-up Fee Escrow" pursuant to the Escrow Agreement executed by ACAP, Plaintiffs, and Kingdom Trust Company. D.I. 180, Ex. 1 ¶¶ 20, 22; PX-2; D.I. 196 at 250:10-251:5.

26. The First Amendment, executed December 30, 2020, amended the "Break-Up Fee" to be "fifty percent (50%) of the first Two Million Dollars ($2,000,000) in revenue allocated to and collected by [ACAP] under the LSPA, plus 10% of such revenues collected by [ACAP] from Included Loans closed after January 1, 2021 until the Closing Date or Termination of this Agreement, which amounts shall be deposited in escrow with the Escrow Agent as they are received." JX-7, § 1(A); D.I. 180, Ex. 1 ¶ 30.

#### 4. The OPEX Adjustment

27. The First Amendment added an "OPEX Adjustment" which is "an adjustment for any shortfall in [TLS]'s cash flow necessary to cover its overhead and operating expenses beginning January 1, 2021 and continuing through the Closing Date. Such increases in overhead and operating expenses shall be capped at 110% of the previous year's amount of non-PPP related expenses, plus 100% of all increases directly related to the PPP (including, but not limited to the following fees arising from or increased due to the parties' participation in the PPP; audit fees and costs, accounting fees, SBA fees, legal fees, and $100,000 increase in Josh Kravitz's salary (to $175,000) related to his extra work involved in PPP). The OPEX Adjustment shall be calculated and paid by [ACAP] to [TLS] on a quarterly basis." JX-7 § 1(B).

28. The parties negotiated several material terms, including the definition of shortfall contained in the OPEX Adjustment. PX-4 at 4-6; D.I. 196 at 264:7-269:14.

29. The term "shortfall" in the OPEX Adjustment is undefined in the First Amendment. D.I. 180, Ex. 1 ¶ 28.

**5. The NorthEast Community Bank ("NECB") Line**

30. The First Amendment also restated in its entirety Section 5.01 Conduct of Business Prior to Closing, which added the "NECB Line." Section 5.01 states, in relevant part, that:

> Further, the parties agree that [ACAP] Shall utilize commercially reasonable good faith efforts to assist [TLS] refinance its existing Warehouse Line of Credit with NorthEast Community Bank (the "NECB Line") on or before June 1, 2021. [ACAP] agrees to pay the extension fee in the amount of $50,000 that is required to extend the NECB Line to June 1, 2021. In the event that the NECB Line is not refinanced or further extended before June 1, 2021, and the Closing Date has not yet been reached, [ACAP] agrees to pay the NECB Line off with an approximate adjustment to be made at closing.

JX-7 § 1(E).

31. ACAP agreed to pay the $50,000 extension fee for a warehouse line of credit from Northeast Community Bank ("NECB"), which TLS was required to obtain to continue lending and participating in the PPP. D.I. 180, Ex. 1 ¶ 29.

**C. The Correspondent Agreement**

32. On June 12, 2020, ACAP, Northeast Bank ("NEB"), and TLS entered into the Paycheck Protection Program Liquidity Facility ("PPPLF") Correspondent Agreement (the "Correspondent Agreement") providing that TLS and ACAP would access PPPLF through NEB to finance TLS's purchase of PPP loans. D.I. 180, Ex. 1 ¶ 41; JX-3; D.I. 196 at 48:11-20.

33. Under the Correspondent Agreement, proceeds received from TLS's PPP loans would be distributed according to a waterfall in the following order: (1) payments to the Federal Reserve; (2) holdbacks for the Federal Reserve; (3) servicer reimbursement due to ACAP under Section 5.3; and (4) the remaining amount would be split, with 50% to NEB, 37.5% to ACAP and 12.5% to TLS. D.I. 180, Ex. 1 ¶ 42; JX-3 §§ 5.3, 8.

34. Under Section 5.3(a) of the Correspondent Agreement, "reimbursement for costs incurred by [ACAP] in connection to each application for forgiveness with respect to such Purchased PPP Loan shall be capped at the lesser of (x) $80 or (y) the actual costs associated with the forgiveness application." D.I. 180, Ex. 1 ¶ 43; JX-3 § 5.3(a).

35. Under Section 8 of the Correspondent Agreement, ACAP was responsible for calculating the amounts owed to each party and preparing monthly distribution statements showing the amounts. D.I. 180, Ex. 1 ¶ 44; JX-3 § 8.2. TLS and NEB then approved the statement before distributions were made. D.I. 180, Ex. 1 ¶ 45; JX-3 § 8.3.

36. On March 2, 2021, ACAP, NEB and TLS executed the First Amendment to the Correspondent Agreement, which increased the amount that ACAP could be reimbursed for its servicing costs per PPP forgiveness application it processed to "the lesser of (x) $120.00 or (y) the actual costs associated with the forgiveness application." D.I. 180, Ex. 1 ¶¶ 46-47; JX-11 § 1.3.

### D. The Parties' Conduct in Relation to A&R SPA and First Amendment

#### 1. The NECB Line

37. Pursuant to § 5.01 of the First Amendment, ACAP was required to pay the extension fee in the amount of $50,000 for the existing Warehouse Line of Credit with NEB. JX-7 § 1(E).

38. TLS paid NEB the $50,000 fee to extend the NECB Line, and ACAP has not repaid that fee. D.I. 180, Ex. 1 ¶ 31; D.I. 196 at 77:17-78:6.

39. Prior to trial, ACAP acknowledged that it owed the NECB Line, but that the amount should be dwarfed in light of its counterclaim. D.I. 158 at 3; D.I. 198 at 11:9-12:1.

**2. The Break-Up Fee & OPEX Adjustment**

40. ACAP's obligation to fund the Break-Up Fee from 10% of its revenue from its PPP loans, and to calculate and pay the OPEX Adjustment began in January 2021. JX-7, § 1(A), § 1(B).

41. ACAP collected PPP revenue from January 2021 through December 2022. D.I. 197 at 292:13-15.

42. Around November 2021, TLS became aware that the Break-Up Fee was underfunded and engaged in continuous negotiations for approximately four months with ACAP regarding the Break-Up Fee and payment of the OPEX Adjustment, among other matters. D.I. 196 at 108:10-15; 109:24-110:14.

43. Around March 2022, TLS retained counsel to assist in and continue negotiations with ACAP regarding the Break-Up Fee and OPEX Adjustment. *Id.* at 108:15-18.

44. On July 5, 2022, TLS sent a letter to ACAP alleging that the OPEX Adjustment had never been paid to TLS, and that TLS had also learned that the Break-Up Fee was never properly funded. D.I. 180, Ex. 1 ¶ 34; PX-27; D.I. 196 at 111:2-7.

45. After ACAP made the initial deposit of $1 million in June 2020, it never made any additional deposits into the Break-Up Fee account. D.I. 180, Ex. 1 ¶ 32; D.I. 197 at 292:16-22.

46. ACAP did not pay any OPEX Adjustment. D.I. 180, Ex. 1 ¶ 31.

47. In 2021, TLS began with approximately $4 million in cash and ended the year with approximately $15 million in cash. DX-19 at 8; D.I. 196 at 131:1-7.

48. In 2021, TLS's expenses totaled approximately $1.6 million. DX-19 at 23; D.I. 196 at 92:9-17; 93:1-16.

49. In the following year, TLS began 2022 with approximately $15 million in cash and ended the year with approximately $20 million in cash. DX-19 at 8; D.I. 196 at 131:14-17.

50. In 2022, TLS's expenses totaled approximately $2.2 million. DX-19 at 23; D.I. 196 at 92:9-17, 93:1-16.

**3. The Parties' Respective Terminations on January 1, 2023**

51. The SBA did not approve the transfer of TLS's SBLC license by the amended Drop Dead Date of December 31, 2022. D.I. 180, Ex. 1 ¶ 35.

52. On January 1, 2023, ACAP sent Plaintiffs written notice stating that ACAP was terminating the A&R SPA pursuant to Section 8.01(b)(ii). Specifically, ACAP asserted that the condition set forth in Section 6.01(c) had not been fulfilled by the Drop Dead Date, and such failure was not due to the failure of ACAP to perform or comply with any of the covenants, agreements, or conditions to be performed or complied with by ACAP. ACAP delivered this notice at 12:02 a.m. via hand delivery to Steven D. Kravitz, Trustee, 353 E. 83rd Street, Suite 3H, New York, NY 10028. D.I. 180, Ex. 1 ¶ 36; JX-51; D.I. 196 at 118:6-8.

53. Under Section 9.02, notices and communications that are delivered by hand, with written confirmation of receipt, "shall be deemed to have been given." JX-7 § 9.02. E-mail communications are effective the date sent "if during normal business hours for the recipient, and on the next Business Day if sent after normal business hours for the recipient." *Id.*

54. On January 1, 2023, after ACAP delivered its termination notice, TLS sent ACAP a letter via email stating that TLS was terminating the SPA pursuant to Sections 8.01(c)(i) and 8.01(d)(iii) of the A&R SPA. D.I. 180, Ex. 1 ¶ 37; D.I. 196 at 118:9-23.

**E. The Parties' Conduct in Relation to the Correspondent Agreement**

55. The Correspondent Agreement required ACAP to prepare and deliver to TLS and NEB monthly disbursements statements detailing the waterfall of funds from PPP loans. D.I. 180, Ex. 1 ¶ 44; JX-3 § 8.2. TLS and NEB then approved the statement before distributions were made. D.I. 180, Ex. 1 ¶ 45; JX-3 § 8.3.

56. Prior to March 2021, ACAP's servicing costs were capped at "the lesser of (x) $80 or (y) the actual costs associated with the forgiveness application." D.I. 180, Ex. 1 ¶ 43; JX-3 § 5.3(a). In March 2021, ACAP's servicing costs increased to "the lesser of (x) $120.00 or (y) the actual costs associated with the forgiveness application." D.I. 180, Ex. 1 ¶¶ 46-47; JX-11 § 1.3.

57. Before August 2022, ACAP never took the servicer reimbursement out of the waterfall as set forth in the Correspondent Agreement. D.I. 180, Ex. 1 ¶ 48; D.I. 196 at 204:6-9, 206:24-207:13.

58. On August 5, 2022, LaHaie emailed NEB stating that they had realized that TLS had not covered its share of the servicing costs, which resulted in an overdistribution. DX-39; D.I. 196 at 204:12-208:4.

59. On August 9, 2022, LaHaie emailed TLS, copying NEB, and explained that following a "life-to-date distribution analysis on correspondent fees," TLS had been "over distributed" $1,235,204.49 and requested TLS to wire that amount to ACAP that same week. D.I. 180, Ex. 1 ¶ 49; JX-40.

60. In that same email, LaHaie told S. Kravitz that "the cause of the over-distribution was not holding back the $120/application expense from above the line on the interest waterfall." D.I. 180, Ex. 1 ¶ 50; JX-40.

61. ACAP also calculated that $342,060.51 be withheld from TLS' waterfall distribution in August 2022. D.I. 180, Ex. 1 ¶ 51.

62. On September 13, 2022, LaHaie sent S. Kravitz a disbursement statement that, for the first time, purported to include the parties' respective expense shares under the Correspondent Agreement. D.I. 180, Ex. 1 ¶ 52; JX-42.

63. ACAP subsequently submitted invoices seeking $1,396,899.28 in November 2022, December 2022, and February 2023. DX-42; DX-43; DX-44; DX-45. ACAP attributed the increase from the amount originally requested in August 2022 to the additional loans that had been serviced during the intervening period. D.I. 196 at 209:17-13-211:18.

64. Plaintiffs have not reimbursed ACAP the amounts that ACAP demanded. D.I. 180, Ex. 1 ¶ 52.

## II. LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The classical statement of the burden of proof in an ordinary civil case such as this is that the facts must be proved by a 'preponderance of the evidence.'" *Burch v. Reading Co.*, 240 F. 2d 574, 578 (3d Cir. 1957). "It is within the province of the district court as the finder of fact to "make subjective credibility determinations about the witnesses who testified." *W. R. Berkley Corp. v. Nolan*, No. 22-1537-GBW, 2024 WL 4604863, at *12 (D. Del. Oct. 29, 2024).

## III. DISCUSSION

Plaintiffs commenced this action alleging that ACAP breached the terms and conditions set forth in the A&R SPA. Plaintiffs contend that, pursuant to the contract, ACAP is obligated to pay (1) the OPEX Adjustment, (2) the Break-Up Fee, and (3) the NECB Line. D.I. 190. Plaintiffs further allege that ACAP failed to fulfill these obligations and seeks appropriate relief. *Id.* ACAP asserts a counterclaim seeking the return of $1,396,899.28 based on an alleged overdistribution under the Correspondent Agreement. D.I. 193.

### A. Plaintiffs Fail to Establish that ACAP Materially Breached the A&R SPA

The parties dispute whether ACAP breached the A&R SPA. Resolution of that issue turns on several factors, which the Court addresses below. *See MRPC Christiana LLC v. Crown Bank*, No. N15C-02-010, 2017 WL 6606587, at *3 (Del. Super. Ct. Dec. 26, 2017) ("Whether conduct is a breach of contract or a material breach of contract is ordinarily a question for the trier of fact."). A threshold issue the Court must resolve is which party's termination was effective first. Plaintiffs contend that ACAP's termination was ineffective because ACAP materially breached the A&R SPA by failing to fund the Break-Up Fee and pay the OPEX Adjustment and the NECB Line. D.I. 190 at 1. To resolve this issue, the Court must examine the contractual provisions governing termination.

#### 1. ACAP's Termination Was Effective and Valid

The Court begins with the language of Article VIII, Termination of the A&R SPA, which outlines the conditions related to termination, to determine whether ACAP satisfied the applicable termination provision. On January 1, 2023, at 12:02 am, pursuant to § 8.01(b)(ii), ACAP hand delivered its written termination notice to Plaintiffs. FF ¶ 52. Under § 8.01(b)(ii), ACAP could terminate, by written notice, if any of the conditions set forth in §§ 6.01 or 6.02 had not been

fulfilled by December 31, 2022, unless such failure shall be due to the failure of ACAP to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by ACAP prior to Closing. FF ¶ 20. On the same day, but after ACAP's delivery, TLS sent an e-mail to ACAP terminating the A&R SPA under §§ 8.01(c)(i) and (d)(iii). FF ¶ 54. Under § 8.01(c)(i), TLS could terminate, by written notice, if TLS was not in material breach of any provision, and there had been a material breach or failure to perform by ACAP that would give rise to any of the conditions specified in Article VI Conditions to Closing, which could not be cured by ACAP by December 31, 2022. FF ¶ 19. Under § 8.01(d)(iii), either party could terminate if the SBA's approval was not received on or before December 31, 2022. FF ¶ 21.

Both parties delivered their termination notices on Sunday, January 1, 2023, a United States holiday and non-business day. Pursuant to § 9.02 of the A&R SPA, ACAP's hand delivered notice was deemed delivered on January 1, 2023, and TLS's e-mailed notice was deemed delivered the next business day, January 2, 2023. FF ¶ 53. Therefore, ACAP's termination was first. Although ACAP's termination may have been first, that does not necessarily render it effective. Since ACAP terminated the A&R SPA pursuant to § 8.01(b)(ii), ACAP's termination is effective only if any of the conditions set forth in §§ 6.01 or 6.02 were unfulfilled as of December 31, 2022, and such failure was not caused by ACAP's own failure to perform or comply with any of the covenants, agreements, or conditions to be performed or complied with by ACAP. FF ¶ 20. Under § 6.01(c), ACAP and Plaintiffs were to receive the consent of the SBA for the transfer of the SBLC License. FF ¶ 22. Approval by the SPA was not received on or before December 31, 2022. FF ¶ 51. Thus, the remaining question is whether ACAP's own failure to perform prevented the SBA approval from being received on December 31, 2022.

The Court finds that ACAP did not cause the SBA approval to not occur. Under § 5.10(c), ACAP was required to reapply for the license "within thirty (30) days after the termination of the litigation by ExWorks Capital et.al." FF ¶ 18. The litigation, however, had not terminated when ACAP terminated the A&R SPA. *See* D.I. 196 at 166:15-167:2 (Mr. LaHaie testifying that trial is scheduled for July 2026). ACAP's obligation to reapply had not yet been triggered. Therefore, the absence of the SBA's consent was not caused by ACAP. Upon review of the record, the Court finds that Plaintiffs do not identify any failure by ACAP that caused the SBA approval not to occur. Thus, ACAP's termination of the A&R SPA satisfied the conditions set forth under § 8.01(b)(ii), and, therefore, was effective.

**2. ACAP Did Not Materially Breach the A&R SPA by Failing to Fund the Break-Up Fee**

The Court's determination that ACAP's termination was effective does not necessarily foreclose Plaintiffs' claim that ACAP breached independent contractual obligations prior to its termination. *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 139 (Del. Ch. 2023) ("Under the common law default rule, the termination of a contract results in an agreement becoming void, but that fact alone does not eliminate liability for a prior breach." (internal quotations omitted)). "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). Plaintiffs contend that ACAP breached the A&R SPA by failing to fund the Break-Up Fee account from its PPP revenue every month starting in January 2021. D.I. 190 at 6. The Court turns now to Plaintiffs' claim.

The A&R SPA separately addresses the funding of the Break-Up Fee and the circumstances under which the fee becomes payable. The First Amendment to the A&R SPA provides that the

"Break-Up Fee" means "fifty percent (50%) of the first Two Million Dollars ($2,000,000) in revenue allocated to and collected by [ACAP] under the LSPA, plus 10% of such revenues collected by [ACAP] from Included Loans closed after January 1, 2021 until the Closing Date or Termination of this Agreement, which amounts shall be deposited in escrow with the Escrow Agent as they are received." FF ¶ 26. Under § 8.02(b), ACAP was to pay the Break-Up Fee upon termination of the contract under §§ 8.01(c) or (d)(iii). FF ¶ 23. Thus, the A&R SPA distinguishes the obligation to deposit amounts toward the Break-Up Fee and the event that causes the fee to become due. ACAP contends, however, that no obligation to fund the Break-Up Fee arose because it terminated under a provision that did not trigger the fee. D.I. 193 at 7. The Court finds ACAP's position unpersuasive because the A&R SPA explicitly required ACAP to deposit amounts toward the Break-Up Fee during the contract's duration and before the fee became due. Despite ACAP's negotiations with Plaintiffs and Plaintiffs' demand for payment, ACAP never funded the fee beyond the initial $1 million dollars. FF ¶¶ 42-45. Therefore, ACAP failed to fulfill its contractual obligation to fund the Break-Up Fee.

**a. Plaintiffs Are Not Entitled to the Break-Up Fee**

Plaintiffs contend that ACAP's failure to fund the Break-Up Fee constitutes a material breach, and that, because ACAP was in material breach when it attempted to terminate, the termination was ineffective. D.I. 190 at 1. According to Plaintiffs, ACAP cannot simultaneously invoke the A&R SPA's termination provision while failing to perform material contractual obligations imposed by that contract. *Id.* The Court must next assess whether ACAP's failure to fund the Break-Up Fee constitutes a material breach, which Plaintiffs' claim renders ACAP's termination ineffective and entitles Plaintiffs to damages.

The Court finds that ACAP's failure to fund the Break-Up Fee does not constitute a material breach. "A breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, No. 12201, 2017 WL 2729860, at *28 (Del. Ch. June 26, 2017), *clarified on denial of reargument*, No. 12201, 2017 WL 3863893 (Del. Ch. July 27, 2017). The purpose of ACAP's obligation to fund the Break-Up Fee was to ensure that funds would be available if the fee became payable following a termination under §§ 8.01(c) or (d)(iii). The A&R SPA, however, was not terminated under either provision, but under § 8.01(b)(ii). Thus, the condition precedent to ACAP's obligation to pay the Break-Up Fee never occurred, and Plaintiffs never became entitled to payment of the fee. *See Ainslie v. Cantor Fitzgerald, L.P.*, No. 9436, 2023 WL 106924, at *10 (Del. Ch. Jan. 4, 2023) ("Where the parties have created a condition precedent, the occurrence of that condition is necessary to give rise to the other party's duty to perform; if the condition does not occur, the duty never arises."). ACAP's failure to fund the Break-Up did not frustrate the essence or purpose of the A&R SPA, which was the sale of the SBLC license. Accordingly, even though ACAP failed to comply with the funding obligation, that failure did not constitute a material breach and, because the condition triggering the Break-Up Fee never occurred, no Break-Up Fee is owed by ACAP to Plaintiffs.

For the foregoing reasons, the Court finds in favor of ACAP on Count II Breach of Contract – Break-Up Fee and Count III Declaratory Judgment – Break-Up Fee. Because the Court finds in favor of ACAP on Count II and Count III, the Court need not reach ACAP's remaining defenses for these claims.

### 3. ACAP Did Not Breach the OPEX Adjustment

The Court next turns to Plaintiffs' claim that that ACAP breached the A&R SPA by failing to pay the OPEX Adjustment. OPEX Adjustment is defined as "an adjustment for any shortfall in [TLS]'s cash flow necessary to cover its overhead and operating expenses beginning January 1, 2021 and continuing through the Closing Date." FF ¶ 27. The OPEX Adjustment was to be calculated and paid by ACAP to TLS on a quarterly basis. *Id.* ("The OPEX Adjustment shall be calculated and paid to Buyer to Company on a quarterly basis.").

Plaintiffs assert that ACAP did not pay the OPEX Adjustment to which Plaintiffs are entitled. D.I. 190 at 6. Plaintiffs contend that "shortfall" is the difference between TLS's total (PPP and non-PPP) operating expenses and its non-PPP income. *Id.* at 5. ACAP counters that "shortfall" is the difference between revenue (what TLS had) and expenses (the amount TLS needed to cover). D.I. 193 at 12. "Shortfall" is not explicitly defined in the A&R SPA or the First Amendment. FF ¶ 29. Thus, the Court must first construe the term "shortfall" to determine whether ACAP breached its obligations under the A&R SPA.

#### b. The Plain Meaning of "Shortfall" Is Consistent with ACAP's Interpretation

"When interpreting a contract, a court must first decide whether the contract is unambiguous with respect to the question disputed by the parties." *In re Verso Corp.*, 806 F. App'x 130, 132 (3d Cir. 2020). Whether a contract is ambiguous is a question of law. *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005). "[A] term is not ambiguous simply because it is not defined." *Sassano v. CIBC World Mkts. Corp.*, 948 A. 2d 453, 468 n.86 (Del. Ch. 2008). Moreover, "a contractual provision is not rendered ambiguous simply because the parties in litigation differ as to the proper interpretation." *Bailey v. Tektronix, Inc.*, No. 21-1268, 2022

WL 4132881, at *4 (D. Del. Sept. 12, 2022), *aff'd*, No. 24-1603, 2025 WL 1341876 (3d Cir. May 8, 2025) (cleaned up). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). .

"[T]he clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms 'establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *NAMA Holdings, LLC v. World Market Center Venture, LLC*, 948 A.2d 411, 418 (Del. Ch. 2007). In other words, the Court must "interpret the contract's terms according to the meaning that would be ascribed to them by a reasonable third party." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 547 (Del. Super. 2005). Delaware law is clear that "[a]mbiguity does not exist simply because the parties disagree about what the contract means" and "extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). "Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Rhone-Poulenc Basic Chemicals Co.*, 616 A.2d at 1196. "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." *Northwestern Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996).

The Court finds that the provision at issue is not ambiguous. Given the absence of a definition in the A&R SPA, the Court first considers the context in which the term "shortfall" is used. *See Demetree v. Commonwealth Tr. Co.*, No. 14354, 1996 WL 494910, at *4 (Del. Ch. Aug. 27, 1996) ("[I]f there is uncertainty concerning the meaning of contractual language, the Court should consider the context and circumstances in which the words were used in order to determine the intended meaning."); *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("To determine what contractual parties intended, Delaware courts start with the text."). The term "shortfall" is used in connection with the cash flow needed by TLS to cover its overhead and operating expenses. Thus, if TLS's cash flow is insufficient to cover its overhead and operating expenses, a shortfall results. Accordingly, "shortfall" equates to the amount by which TLS's available cash flow is less than its overhead and operating expenses. The language further provides that increases in overhead and operating expenses are subject to specific limitations. Such increases are "capped at 110% of the prior year's amount of non-PPP related expenses, plus 100% of all increases directly related to the PPP." FF ¶ 27. Thus, for the purposes of calculating any shortfall, the overhead and operating expenses are calculated in accordance with these limitations. Any resulting shortfall represents the amount by which TLS's cash flow is insufficient to cover those overhead and operating expenses.

Having considered the context of the OPEX Adjustment and reading the contract as a whole, the Court finds that the term "shortfall" means the amount by which TLS's cash flow is insufficient to cover the applicable overhead and operating expenses as outlined in the definition of OPEX Adjustment. *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) (courts in Delaware "interpret clear and unambiguous terms according to their ordinary meaning."); *see also Sunline Com. Carriers, Inc.*, 206 A.3d at 846 ("When the contract is clear

and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence." (internal citations omitted)).

### c. Plaintiffs Fail to Prove that a Shortfall Existed

The Court next considers whether ACAP breached its obligation to pay the OPEX Adjustment. Based on the evidence presented, the Court finds that Plaintiffs did not experience a shortfall within the meaning of the OPEX Adjustment.

Joshua Kravitz ("Mr. Kravitz"), CEO of TLS, testified that TLS's expenses had increased over the years. D.I. 196 at 91:13-93:15; 94:1-4. Specifically, TLS's operating expenses totaled approximately $1.6 million in 2021 and $2.2 million in 2022. FF ¶¶ 48, 50. Mr. Kravitz also testified that TLS had approximately $4 million in cash at the beginning of 2021 and $15 million at the end of 2021, and approximately $15 million in cash at the beginning of 2022 and $20 million at the end of 2022. ¶¶ FF 47, 49; D.I. 196 at 130:22-131:19. Critically, Mr. Kravitz acknowledged that, if all cash were included in TLS's cash flow, no shortfall would exist. D.I. 196 at 132:25-133:16. As discussed above, shortfall is the amount by which TLS's cash flow is less than its overhead and operating expenses, where increases in overhead and operating expenses are capped at 110% of the prior year's amount of non-PPP related expenses, plus 100% of all increases directly related to the PPP. Applying this definition and considering the evidence concerning TLS's cash flow and expenses together with Mr. Kravitz's admission, the Court finds that no shortfall existed during the relevant period. Plaintiffs' contention that a shortfall nevertheless existed depends entirely on its alternative calculation of the term, which excludes PPP revenue. As discussed above, the Court has rejected that interpretation. The Court therefore concludes that no shortfall existed, no OPEX Adjustment was due, and ACAP did not breach the OPEX Adjustment by failing to make such payment.

For the foregoing reasons, the Court finds in favor of ACAP on Count I Breach of Contract – OPEX Adjustment. Because the Court finds in favor of ACAP on Count I, it need not reach ACAP's remaining defenses to that claim.

**4. Plaintiffs Are Entitled to the NECB Line**

The Court next turns to Plaintiffs' claim that ACAP breached the A&R SPA by failing to pay the NECB Line. Pursuant to § 5.01 of the A&R SPA, ACAP agreed to pay an extension fee in the amount of $50,000 to extend the NECB Line to June 1, 2021. FF ¶ 31. However, TLS paid the fee and has not been reimbursed by ACAP. FF ¶ 38. ACAP concedes that it owes the NECB Line, but that the amount should be dwarfed in light of its counterclaim for overdistribution. FF ¶ 39.

As the Court explains below, ACAP fails to establish that Plaintiffs owe the purported overdistribution. Thus, ACAP's claim for recovery of the alleged overdistribution and, consequently, its defense of reduction or setoff fails, and Plaintiffs are entitled to the NECB Line. To the extent that Plaintiffs contend that ACAP's failure to pay the NECB Line constitutes a material breach, that contention fails. Although ACAP's failure to reimburse Plaintiffs the NECB Line constitutes a breach, Plaintiffs failed to demonstrate that payment of the NECB Line constitutes the "essence" of the A&R SPA or that ACAP's failure deprived Plaintiffs of any benefit contemplated by the A&R SPA. *See Mrs. Fields Brand, Inc.*, 2017 WL 2729860, at *28. Nor have Plaintiffs demonstrated that any loss arising from ACAP's failure cannot be readily ascertainable or adequately compensable through monetary damage. *See Marston v. Tenerovich*, No. 10208, 2015 WL 5050130, at *4 (Del. Ch. Aug. 26, 2015) (setting forth the factors courts consider in determining whether a failure to perform is material). Accordingly, the Court concludes that ACAP's failure to pay the NECB Line breached the A&R SPA, but that the breach

was not material. Thus, the Court finds in favor of Plaintiffs on Count IV Breach of Contract – NECB Line.

**B. ACAP Is Not Entitled to Reimbursement of the Alleged Overdistribution**

In its counterclaim, ACAP seeks reimbursement from TLS for an alleged overdistribution of funds resulting from a calculation error of the waterfall payments under the Correspondent Agreement. The Court begins with the language of the Correspondent Agreement and Amendment.

The Correspondent Agreement governs the distribution of proceeds between TLS, ACAP, and NEB, but does not contain any provisions specifying the parties' obligations in the event of overpayment. However, the absence of a provision does not permit a party to retain funds to which it was never entitled. Courts in Delaware use implied covenants when contracts are "truly silent" about an issue, and the express terms "naturally imply certain corresponding conditions," thereby warranting the "terms to be enforced according to the reasonable expectations of the parties at the time of contracting." *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (cleaned up). "An implied covenant is inherent in all contracts and ensures that parties do not frustrate the fruits of the bargain by acting arbitrarily or unreasonably." *Id.* (cleaned up). "To prove a breach of an implied covenant [of good faith and fair dealing], [ACAP] must demonstrate by a preponderance of the evidence (i) a specific, implied contractual obligation; (ii) breach of that obligation; and (iii) resulting damage." *Balooshi v. GVP Glob. Corp.*, No. N19C-10-215, 2022 WL 576819, at *9 (Del. Super. Ct. Feb. 25, 2022), *aff'd*, 285 A.3d 839 (Del. 2022).

**1. A Specific Implied Contractual Obligation Exists**

The Court finds that the Correspondent Agreement contains a specific, implied contractual obligation to return any overpayment made by ACAP. The requirement to return overpayments

constitutes the type of "obvious omission" that implied covenants address because implying such enforces the parties' reasonable expectations without altering any negotiated rights or protections. *See Intermec IP Corp. v. TransCore, LP*, No. N20C-03-254, 2023 WL 5661585, at *5 (Del. Super. Ct. Aug. 23, 2023). A party is not entitled to retain funds that it received in excess of its contractual entitlement merely because the applicable contract does not expressly contain a provision stating that an overpayment must be returned. *Id.* Thus, ACAP has established the existence of a specific, implied contractual obligation. The Court next addresses whether ACAP proved that TLS breached the implied contractual obligation, which turns on the proper calculation of the waterfall distribution.

**2. ACAP's Methodology Fails to Establish Its Entitlement to the Alleged Overdistribution**

The evidence presented at trial indicates that the parties agree that ACAP's reimbursement for costs incurred in servicing the PPP loans was to be calculated on a per-loan basis, and that the costs associated with servicing each loan varied based on the circumstances of the particular loan. D.I. 196 at 63:18-23; 64:23-65:18; 196:3-7; 202:2-5. ACAP's founder, Mr. LaHaie, acknowledged that the waterfall payment distribution had been "set up incorrectly at the start," resulting in the purported overdistribution of funds. D.I. 196 at 206:24-209:16. ACAP notified TLS of the overdistribution. FF ¶ 59. After receiving notice, TLS sought to understand the basis for ACAP's per-loan calculation. D.I. 196 at 111:14-18. According to TLS, ACAP's response provided "insufficient substantiation" because it did not delineate the per-loan cost. *Id.* at 111:19-112:4. The parties' disagreement concerns the method by which the amounts attributable to the individual applications comprising each loan should be determined.

Mr. LaHaie testified that it would be "impossible" to document the work performed for each loan because the costs encompass various resources involved in servicing the loans, such as personnel, legal review, and the broader infrastructure supporting the loan servicing operation. *Id.* at 201:10-202:1; 202:12-20. In contrast, TLS's witness, Mr. Kravitz, testified that the costs should have been accounted for on a per-loan basis, with various loan categories separately identified to reflect the different expenses associated with each category. D.I. 196 at 105:17-106:5.

The Correspondent Agreement provides that "reimbursement costs incurred by [ACAP] in connection with each application for forgiveness with respect to such Purchased PPP Loan shall be capped at the lesser of (x) $80.00 or (y) the actual costs associated with the forgiveness application." FF ¶ 34. In March 2021, an amendment was executed, which increased the reimbursement for ACAP's servicing costs per PPP forgiveness application to "the lesser of (x) $120.00 or (y) the actual costs associated with the forgiveness application." FF ¶ 36. In other words, the provision establishes a cap on the costs that ACAP may seek with respect to each application. The recoverable amount is the lesser of $80 (amended to, $120) or the actual costs incurred *in connection with that application*. Thus, where the actual costs exceed $80 (amended to, $120), the recoverable amount is limited to $80 (amended to, $120); where the actual costs are less than $80 (amended to, $120), only the actual costs may be sought.

The Court finds that ACAP fails to prove, by a preponderance of the evidence, that its calculation of costs incurred was in accordance with the Correspondent Agreement. Testimony by ACAP's witness establishes that ACAP did not separately delineate the costs attributable to each application in accordance with the Correspondent Agreement because it deemed such an allocation infeasible. Instead, ACAP provided a life-to-date distribution analysis that lacked the detailed information necessary to substantiate or explain how the alleged overdistribution amount

was calculated. FF ¶ 59. The subsequent disbursement statements and invoices that ACAP provided likewise failed to provide the detailed information necessary to substantiate or explain how the alleged overdistribution amount was calculated. FF ¶ 63.

Moreover, at trial, Mr. LaHaie testified that ACAP had created a spreadsheet detailing the flow of ACAP's PPP costs underlying each loan forgiveness application. D.I. 196 at 199:21-200:5. However, that document which ACAP relies on likewise fails to clarify how ACAP derived the overdistribution amount it claims is owed or provide the underlying details necessary to substantiate those amounts. *See* JX-1000. For example, Mr. LaHaie testified that, in June 2021, Tayloe/Gray, a marketing firm, assisted ACAP in exploring names for a new business, which would become NEWITY. D.I. 197 at 321:12-322:3. Mr. LaHaie nevertheless testified that ACAP charged 100% of Tayloe/Gray's work from June 2020 through August 2022 to PPP costs, despite also testifying that Tayloe/Gray's work exploring the new business name, in June 2021, was separate and related to the business, NEWITY. *Compare* D.I. 197 at 323:4-325:15, *with* D.I. 197 at 321:12-322: Mr. LaHaie further acknowledged, when asked whether 100% of the work performed by Tayloe/Gray was a direct PPP cost to ACAP, that it was "most of their work." D.I. 196 at 324:6-325:3. Mr. LaHaie nor the spreadsheet provide any explanation for this discrepancy, and critically, do not identify the basis upon which ACAP determined that 100% of Tayloe/Gray's charges were properly attributable to PPP costs underlying each loan forgiveness application.

While the record contains additional examples of inconsistencies in the costs that ACAP claims to have incurred, the Court finds that the overarching issue is that ACAP has failed to demonstrate that its calculations are in accordance with the Correspondent Agreement. As discussed above, the costs associated with servicing each loan vary based on the circumstances of that particular loan. Thus, determining the costs properly attributable to a particular loan

necessarily requires consideration of the circumstances and services associated with that loan. The Correspondent Agreement requires the costs to be determined on a per-loan basis, rather than aggregate figures that lack sufficient detail to establish how those figures were allocated among the individual loans.

ACAP's methodology is inconsistent with the methodology required by the Correspondent Agreement and produces a materially different economic result, rather than merely reflecting a computational error. As Mr. Kravitz explained, the provision was intended to operate as a cap, not a flat charge applicable to every application. D.I. 196 at 105:10-106:5. While some applications incurred servicing costs exceeding the cap, others incurred servicing costs below the cap. For example, under the amendment, if one application costs $550 to service and another costs $5, the charge would be $120 for the first application and $5 for the second application. The evidence ACAP presented, however, failed to demonstrate that this distinction was recognized or applied. ACAP's methodology effectively permits the amount associated with one application to alter the amount attributable to another application, rather than applying the cap based on the costs associated with *each individual* application. The Court concludes that ACAP's methodology is not contemplated by the Correspondent Agreement. Therefore, ACAP fails to establish that its calculations were performed in accordance with the methodology contemplated by the Correspondent Agreement and, consequently, fails to establish that Plaintiffs owe the alleged overdistribution. Because ACAP failed to establish that Plaintiffs owe the alleged overdistribution, it cannot prevail on its counterclaims for unjust enrichment, theft/conversion, money had and received, restitution/payment by mistake, or breach of implied covenant of good faith and fair dealing.

For the reasons set forth above, the Court finds in favor of Plaintiffs on Counts I-V related to ACAP's claim of overdistribution. Because the Court finds in favor of Plaintiffs, it need not reach Plaintiffs' remaining defenses for those claims.

## IV. CONCLUSION

For the foregoing reasons, the Court enters judgment in favor of ACAP on Plaintiffs' claims for breach of contract arising from the OPEX Adjustment and Break-Up Fee and on Plaintiffs' claim for declaratory judgment concerning the Break-Up Fee. The Court enters judgment in favor of Plaintiffs on their breach of contract claim concerning the NECB Line and ACAP's counterclaims for unjust enrichment, theft/conversion, money had and received, restitution/payment by mistake, and breach of implied covenant of good faith and fair dealing. The Court will issue an Order consistent with this Opinion.